We will hear argument this morning in Case 24-7, Diamond Alternative Energy v. the Environmental Protection Agency. Mr. Wall? Mr. Chief Justice, and may it please the Court, the EPA waiver here allows California to limit the number of vehicles that run on liquid fuel. Petitioners make and sell liquid fuel, so vacating the waiver would redress their injuries in two ways. First, as Justice Kavanaugh explained in Energy Future Coalition, part of the injury in a case like this one is the denial even to compete in the marketplace. Vacating the waiver redresses that injury perfectly. Indeed, it's the only thing that can. Second, even setting aside that clear rule, this Court recognized in Department of Commerce that litigants may rely on common-sense inferences about third-party behavior. It doesn't take much common sense to figure out that if California limits the number of cars that can run on gas, automakers will make fewer cars that run on gas. Remember that we're here because California asked for and EPA granted a waiver because California said it needs its own standards. California even intervened by telling the Court below that its standards are likely to reduce fuel consumption. The common-sense inference is that this waiver matters in the real world, not that it is completely meaningless. But if we needed hard evidence, we had plenty of it, five kinds. One, our declaration showing that California's standards have historically harmed us. Two, California's and EPA's actions and statements in 2021 and 2022 saying that their standards are likely to reduce fuel consumption. Three, California's two expert declarations from CARB officials in 2022 saying that their standards are likely to decrease fuel consumption. Four, the intervening automakers' admission that without the waiver, some of their competitors were likely to back away from electrification. And fifth, Toyota's comment and public reporting also indicating that some automakers would back away from electrification without the waiver. Taken together, that is more than enough evidence to establish redressability. I welcome the Court's questions. Mr. Wall, taking a step back from the evidence you just provided or the points you just made, what is your rule? How would you articulate your categorical rule? Our rule is that when the government denies a party the ability to compete in a marketplace and the party sues to have that market restriction lifted, there is redressability because the party is asking for the thing to be taken away that's causing its injury. Is there some degree of hindrance to that party that has to be shown to apply your rule? I don't think so because we're not talking about just sort of some indirect impediment. I'm talking about a market restriction that directly tilts or forecloses the playing field. It says you can't sell your product, your good, your service into a particular market. Either wholly or here partially, up to some certain cap. So how would you show that? Well, what I'd say is you show it by the nature of the injury. So just like in a competitor standing case, like in National Credit Union, if you come in and you say the government is under-regulating one of my competitors, right, this Court said that's competitor standing. Government agrees with that. That's footnote two of their brief. This is the same thing. It's just that instead of picking winners and losers among particular market participants, you're picking winners and losers as among markets. So if you come in and you say I have something that yesterday I could freely sell and today I cannot freely sell it as a result of a government regulation that directly forecloses me, you have standing on our view. So Mr. Wall, how is that consistent with the Court's holding in Worth v. Selden? I know you talk about it briefly in one of your footnotes, but that seems to me to map on exactly with what you're now saying. There was an exclusionary zoning restriction that prevented home builders and others from building in a particular area, and the Court found that that was not sufficient for addressability. So the Court looked at it more as a sort of predictable effects type case and said, well, we actually think it's very speculative whether you could get into the neighborhood at all. And so the Court saw it, that case, through a very different lens, and of course nobody was there. But I guess I'm questioning whether or not it really is a different lens. I mean, the Court said if you're right that the rule is just a common sense, you don't really have to have evidence. We just sort of infer based on the relationships in the marketplace and whatnot. That's exactly what was happening there. The home builders said we aren't going to be able to build our houses, our single family homes, in this zoned-off area. And so we said, I think, when you look at the case, that there's got to be evidence that there actually would be home building in this area absent that regulation. And I think that's the same thing as saying here that you can't just rely on the fact that we would think that lifting this restriction would allow for more cars to be built. There actually has to be evidence that there would be more cars built, you know, fuel-ingesting cars in this environment. So Justice Jackson, what I'd say is the Court has sort of two lines of cases, and that's why we've made two arguments, because we think we win under both lines. You have some sets of cases, like the equal protection cases or the competitor standing cases, where you say that the nature of the injury gives you causation or addressability. It's the ability not ‑‑ you're denied the ability to compete in the marketplace. You are discriminated against no matter what would happen in the marketplace itself. And then you have certain lines of cases, like Department of Commerce or Worth v. Selden, where you say, look, we're going to look at what the likely predictable effects are in the market. And what distinguishes the two? Is it that we have corporations in one? Like, how would we know which line we're supposed to apply in this situation? I think it depends on whether the Court believes that the nature of the injury gives you causation or addressability. So as I understand the competitor standing cases, and I think they're correctly decided, if I'm in a market and I allege or show that I am competing with, you know, Mr. Klein in a market, and the government comes in and tilts the playing field toward Mr. Klein, I have standing because, by definition, the nature of the injury is that the government tilted the playing field, and I have addressability because I want the playing field to be level again. That's what I'm asking for. And we see our cases exactly the same. And I think the D.C. Circuit got this exactly right. I'm sorry, though, because I think what Justice Jackson may be getting to is you want us to announce an absolutist rule, which in the standing area is very difficult to do because it really does rely so much on facts. You've marshaled many facts to support your standing. In this case, the D.C. Circuit thought, erroneously, it's been conceded by the government, that this regulation was going to expire in 2025. So let's assume you came in a month before the expiration and that the rule was never going to be renewed. Okay? Why would you have standing? Under your rule, merely because the barrier exists, you have standing. But what the court here said is, you might have standing, but you don't have redressability because the manufacturers can't change their production right now. And this rule expires. They made a mistake on that. It's conceded. So isn't the issue whether the confluence of all the facts you put forth show that this is more like the D.C. Circuit case that Justice Kavanaugh relied upon, or more like the Chamber of Commerce v. EPA case, where he said that the affidavits back and forth show that that particular set of claimants wouldn't really be successful in selling their products? So why isn't it always a factual dispute? Here's the importance of the rule, Justice Sotomayor. Here's why you need one, and here's why I think the D.C. Circuit was right to adopt one in Energy Future Coalition. The importance of the rule is that absent the rule, if you walk in and you put a market restriction on at a time when you think the restriction doesn't matter, or at least you can debate whether it matters, then the other side will always say, aha, you don't have predictable effects. You can't satisfy Department of Commerce. You can't satisfy Wharton. And here it's even worse than that. There is a 60-day time limit. Something is an advisory opinion. And at a certain point, we move from giving you relief or not, but that's not this case. Justice Sotomayor, I want to be very clear. Why would we announce a rule that's not pertinent to this case? I do not want an advisory opinion. They now acknowledge — So they now acknowledge that they were wrong. They'll have to answer as to why they're even defending the rule if it has no effect, which is my logical question. If it doesn't affect the market, why have the rule at all? But we can go — let them answer that. I look forward to hearing them do it, but I just — I want to say quickly, in this case, everybody now acknowledges the greenhouse gas standards persist into the future indefinitely. It would nothing changes from now to the end of time. Absent a rule, they can come in and say, the market is exceeding our standards right now. You can't show that any automaker will do anything. There's a 60-day time bar in the statute. If we can't sue when we sued, we're out of luck forever. The advantage of our rule is that it matches up with the injury perfectly and it makes sure that in the future, if the price of electricity goes up or the availability of rare-earth minerals for battery changes, we can affect the market. Let's assume that they had affidavits from every single car manufacturer. This is like a chamber of commerce versus EPA. Every car manufacturer, every single one of them, says, can't change it, won't change it. Do you still win? Can't change it, won't change it. You're the fuel people, but it's not going to affect you because they're going to follow it no matter what. Yes, we do. The evidence here is actually the contrary, pages 99 to 11, but I take the point. Yes, because the question isn't what are automakers doing today when we get locked out of the market. It's, yes, we have a pocketbook injury, we believe, but we have an injury that occurs even earlier than that. We are denied the ability to go out and compete in the marketplace, to convince automakers that they shouldn't be making as many electric vehicles. They should be making more vehicles that run on liquid fuel, and the government has foreclosed us from doing that, and it's no different than the examples we give in our brief. What if, in Justice Sotomayor's example, the manufacturers stand with the California regulators and with EPA on the very first day the regulation is rolled out and say, we support this, we want a greener earth, we want to prevent climate change, and this is going to be cheaper for our business anyway. So there's no question of a time lag. They're just fully on board. And so kind of as Justice Sotomayor's hypothetical is saying, but I want to imagine it happens on day one. Why should you have standing and redressability at that point? Because it seems to me, Justice Barrett, let's assume just for a moment that it's unlawful, but that the entire industry buys in. They cut a deal with California. They accept the standards, they want to abide by them, and they all agree, and they want to lock in the demand and force consumers that way because they think it will be profitable for the automaking industry. We still are harmed in a direct way. The government has tilted the playing field and foreclosed us from being able to freely sell our product. And we ought to be able to make our arguments on the merits and get our day in court, regardless of whether the directly regulated industry cuts a deal or not. We have an injury. We have been locked out of a marketplace that injures us financially. It's caused by the regulation. I don't take anybody to be disputing that. So the only question is redressability. And that should be easy in a case like this one. If everybody grants that the regulation is causing your injury, vacating the regulation or California standards that they're allowed to adopt redresses the injury. Well, in light of all that, why do you think you need a special rule? Why isn't the ‑‑ in the situation that's present here and in others like it, there's a strong inference that this is likely to have an effect. Now, maybe there could be situations in which by the submission of affidavits like the ones that have been discussed or statements by all the car makers, it could be shown that, no, contrary to what one would normally think, this is not going to have any effect, in which case you might lose on standing. But I'm not sure why you think you need a special rule in this situation. Justice Alito, I don't want to fight it too hard. If the court says, look, you had far more here than we had before us in Department of Commerce, you can have a common sense inference. It's predictable under Department of Commerce. There are many situations in which standing depends on a probabilistic inquiry. And those are very fact specific. So, you know, you have to ask what is the probability in a particular situation. When someone says I'm threatened with, you know, I expect that this will harm me, we assess the degree of the risk. So I'll say two things, Justice Alito. First, what I'm worried about is that we've been ping ponged around for going on 15 years trying to get a determination on the merits. And if we get sent back for a predictable effects analysis or all the rest in this and future cases, I worry about where we end up. But second, and more logically, doctrinally, in the competitor standing cases, the court doesn't say, well, if we level the playing field, would the customers that you seek to compete for fairly come to you rather than the other guy? And I think that's the wrong way to look at those cases. Your injury isn't just what happens in the marketplace when you are allowed to compete and you think some dollars are taken out of your pocket. You don't really know because the point is you've been locked out of the marketplace. And that's why I think the rule is important. I think it's the same logic here as in the competitor standing cases. And it's not like the court doesn't do that in other areas. California is here saying if we are prevented from enforcing our standards, and this court has said it many times, that is injury, indeed irreparable injury to the state. Without knowing what it will do under the statutes, whether it will work, whether it will get a penalty or a conviction, the court often says if the sovereign doesn't get to enforce its statute, that is injury and the state's got standing to come in regardless. I would think that you would have injury in fact under our cases if the effect of this is to cause your clients to be unable to sell one car. Wouldn't that be correct? We sell one gallon of liquid fuel. I'm sorry, one gallon of liquid fuel. Yes, that's true. So that doesn't seem like very much to have to show. Justice Alito, I agree, but that's what makes the case so odd. The court of appeals said, all right, we're not going to contest that there's injury in fact and causation. We're not going to say there is, but we're not going to say there isn't. We're going to assume that you've got injury in fact, that you sell one gallon less of gasoline. And we're going to assume it's caused by the regulation, but we think you haven't shown redressability. But I think that the reason for that was a combination of two things. One was what Justice Sotomayor said, that they were mistaken about the end date of the regulation. The other, you know, honestly, was that you didn't put on much evidence. You know, and here too, you're sort of common sense inference. It is a common sense inference, but if it's such a common sense inference, it should be easy to put on evidence. And here there wasn't a lot of it. So Justice Kagan, I don't think that's fair. We had an on-point decision from the D.C. Circuit dealing with this very industry, fuel producers. We had our own declarations. We had California's expert declarations filed after we brought this case. So when California intervened, if you look at pages 110 and 115 of the J.A., California put in declarations from two CARB experts, and in both of them, their own experts. These are not statements of agreement. I agree with you. I think it would be easy to read those declarations back to California and say, what do you make of those? But your side didn't really make that argument. Well, we pointed to our declarations. We pointed to California's statement in 2021 at page 66 of the J.A. saying these standards are critical, their word, to reducing fuel consumption. We pointed to EPA's statements in adopting the waiver saying they need their own standards. We pointed to the intervener automaker's admission saying, hey, we've invested a lot in electrification. If you don't make them meet the same standard, we might be at a, quote, competitive disadvantage. And I guess my point back, Justice Kagan, is, look, if I think my point to you is, surely, if that's all in the record, you deserve to go forward. Oh, I agree. I agree. So then why do we need the rule? Why do we need a bright-line rule if you satisfy the evidence standard? First, because I think it's logically the correct inquiry. It's not what happens in the market. It is, as Justice Kavanaugh said in Energy Future Coalition, your inability to get into the marketplace in the first instance. That's a key part of the injury. And not adopting the rule misses that part. But I thought the point of the rule was that you didn't want to have to provide the evidence. That you say, yes, we have the evidence, but we don't need it, because under this rule that I'd like for you to adopt, we have redressability. I don't think that evidence is relevant for the same reason it's not in competitive standing cases. But if the court disagrees on our rule, I agree. We should win on a standard Department of Commerce. What is the likely effect here? And we put in far more evidence than you would typically see in a case like this. And with all respect to the court below, we got dinged, not because we didn't do enough. Any lawyer looking at what we had done at the time would have said we had redressability. We got dinged in fairness because the court below moved the goalposts. We had Energy Future Coalition and plenty of evidence to satisfy it. And the court below, without citing it... That is really unfair, Mr. Wall. They were under a mistaken understanding, partly because of the submissions in this case, where you were just complaining in your papers about this rule being in effect only till 2025. So, Justice Sotomayor, that is part of the mistake that the Court of Appeals made, but its error was more fundamental. When it looked at standing, it should have said, we have Energy Future Coalition, it tells us that we have redressability in the same industry, fuel producers, if the regulation locks them out of the marketplace. It didn't say that. It turned to the evidence. And then rather than on the evidence saying, well, this is more than enough to satisfy cases like Department of Commerce or Alliance of Hippocratic Medicine, it said, not enough here. And what that really amounts to at the end of the day is we couldn't get an affidavit from an automaker who didn't intervene. They sat on the sidelines. They didn't want to participate. And because we couldn't get them to stick their hand up, we didn't have someone saying, here is how I will change my fleet absent the waiver. And that's what we didn't have. And if that's what it's really going to take for an indirectly regulated party to get into court, it's going to be far more difficult to challenge governmental action. And these cases are going become more expensive, and frankly, arbitrary, because it will turn on whether the directly regulated industry likes the rule or they don't. And as far as my clients are concerned, that shouldn't matter one whit. Why will you be ping-ponged around? You want the categorical rule. Imagine that I am not sympathetic to the categorical rule, but think that your clients could demonstrate standing based on the common sense inferences. You said that you've been ping-ponged around for 15 years, and so that's why you want the categorical rule. But if we just said you had standing, how can you be ping-ponged around? Oh, if this court declares that there's a common sense inference and applies Department of Commerce and says they met it here, you're right. We should be able then to get a determination on the merits. And as I say, I think the rule is right. But on either of those views, as long as the court says what we say about Department of Commerce, you're right. We would be able to get a determination on the merits, which we've been trying to do for a very long time. Why do you care? On that view of the world, why would you care other than you want to go for the big win as between them? The win is the same either way. I think the rule is right. I think it squares with the competitor's standing cases, and I think the logic of it is right. The injury here is not just what happens out there in the marketplace. We are prevented from getting in at all. And my concern, Justice Farrad, is that if you don't adopt the rule, it will always be an argument about what will happen in the marketplace. And that's very difficult to show once you have a governmental mandate, because the governmental regulation is skewing the entire market. And so as here, even though in the real world, everyone knows that California standards have affected automakers, we have a whole debate now about whether, in fact, as a matter of common sense, they actually affected people. And even if they were affecting them in 2019, well, did things change in 2020 and 2021 in a way that by the time you sued in 2022, you might have had standing before, but now you no longer do? Yes, I think we're right about that debate, but I don't think we should have to have it in every case. Can I understand the rule better? Because I had appreciated from your briefs that you had different theories. So I'm just trying to appreciate what's happening. Are you advocating for the direct regulatory impediment species of this? Is that what is that the rule that you're now articulating and it has something to do with being completely locked out of the market? That's our frontline rule. If the government locks you out of a marketplace or tilts it against you, and you come in to sue to have the playing field leveled, you have standing. That's our frontline rule. And then obviously our second line. But you see how that's a little bit different than saying if there's a direct regulatory impediment. That's different than saying you have to be completely locked out of the market. Well, by direct regulatory impediment, I mean sort of a lockout or as here, a cap, right? It's not that we can't sell any fuel at all. It's that we can only sell so much fuel in California and the other 17 states that have adopted these standards because the automakers have to make a certain number of cars that don't run on the product we made. Where does that end? I mean, I guess I'm trying to figure out. I appreciate your argument that the regulation is on the automakers. And as a result of it being on the automakers, the fuel producers are going to make less fuel. But what about the convenience store operators who are also part of this? They say there are fewer people stopping into the convenience store as a result. Are they in your rule or not? I think that they come much closer to the Department of Commerce. But of course, all I need is some petitioner. But I'm just trying to understand how your rule works. So this splits your petitioner, your plaintiff's class here, because convenience store operators are in, in your class. They're not completely locked out of the market. So your direct regulatory impediment rule doesn't have them. That's right. It's just like competitor standing, right? You can harm, you're harmed because they under-regulated a competitor. That regulation can harm lots of other people, people who supply your inputs and all the rest. You have competitor standing. Everybody else has to satisfy predictable effects, Department of Commerce, Wharton. But the way you, when you answered Justice Jackson, you said your rule is if the government tilts the market against you. And here, that seems like an easy thing to show and not one that would cause a lot of debate. But in many other cases, does the, did the government tilt the market against you? Did it not? How much? That would be a hard thing to show. And, and why shouldn't we just stick with a rule that says we're going to look in each case as to the facts and the evidence, and then we're going to apply reasonable inferences, and we're going to reach a decision rather than try to stick everybody. Do you fit the categorical rule or do you not fit the categorical rule? Justice Kagan, two things. First, it hasn't been a problem on the competitor standing side, and it's not a problem here. We drew a very narrow rule. We took the language of the D.C. Circuit that it had lived with for quite a while. See, I think that the question, are you a competitor, seems a lot easier to answer in a lot more cases than the question, has the government tilted the market against you? But there are a thousand people in every regulation who can come in and say this regulation tilted the market against me. I take the point that that language was a shorthand for what we're saying in our brief, which is the language of the D.C. Circuit, a direct regulatory impediment. And as we explained, what we meant by that and what the D.C. Circuit meant is, are you preventing someone from selling or placing into a market? If it is a direct regulatory impediment, you could sell yesterday, but you can't sell today. You qualify for the rule. So I think it's quite a narrow rule. And the second thing is, why do it? It's the answer I gave to Justice Barrett. Because otherwise, we're going to have to have this debate in every case. And, yes, I think I win as a matter of common sense, but three judges of the D.C. Circuit, as it turned out, disagreed with me. And it seems to me we shouldn't have that debate in every case. Thank you, Counsel. Justice Thomas, anything further? Justice Kagan? Justice Kavanaugh? I'm not sure there's a huge amount of difference between the rule and the backup position. I mean, the rule is based on a common sense, the common sense predictable effects in a particular context. But either way you go, you get to the same destination. I guess I'm not seeing a huge gap. I agree, Justice Kavanaugh. We should win no matter what the court says. But I do think that a case like this, it's not that there should be daylight in the right outcomes. It's that once we make it about evidence, we're going to have to come in every case and there's going to be a debate. Like, well, what do you have to show to trigger a common sense inference? And how common is that common sense? Well, what we said last year in FDA versus Alliance for Hippocratic Medicine, just summarizing standing walls should be, kind of gets at it, doesn't it? I would have thought so too, Justice Kavanaugh, but here we are. But look, I'll be the first to grant that if you take that paragraph in Alliance for Hippocratic Medicine and you say, look, even if we're not going to call it a rule, there are certain categories where we've said the effects seem awfully predictable and this falls into one of the that the court thinks squares more comfortably with its standing precedence in general. It should get us to the same place. Thank you. Justice Gorsuch. I'm sorry. Justice Jackson. So what about corn and soybean growers? Are they in or out? They're in. They... They're in. Yes, they make liquid fuel, various kinds of liquid fuel, ethanol and all the rest. And this rule says, nope, can't go try to convince the automakers to use your fuel. They have to use us and make a certain... So I mean, what about the ones that aren't quite the fuel producers, but they're earlier in the chain? I mean, it sounds to me like your rule is conferring standing on anyone in the chain of production in a product that gets affected as a result of government regulation. I don't mean to reach down the road to all the inputs and suppliers... But how do you stop reaching down the road? Are you the producer? We make and sell liquid fuel and the government says, you could sell to them yesterday, but you can only sell a certain amount today. That is a direct restriction on the product we make and sell that we, by any account, ought to have standing. Thank you. Thank you, counsel. Mr. Kneedler. Mr. Chief Justice, and may it please the court. Petitioners can't contend that there should be a categorical rule establishing redressability whenever the plaintiff challenges government action that poses an impediment to the use of its product without any need for an evidentiary basis for that categorical rule or prediction. That proposal is inconsistent with this court's decisions, which require a factual basis for standing. My friend refers to the Department of Commerce and the idea of a predictable or common sense outcome. In the Department of Commerce, there was an evidentiary record. There was evidence submitted. There were factual findings that undergirded the prediction or the result in the Department of Commerce, where the court could then conclude that people who were answering a survey about or asked to answer a census about their citizenship would be deterred from doing it. It wasn't just a common sense. And that runs throughout this court's standing law, and it's especially important here because this court has indeed said that if the plaintiff is the subject of the regulation, it may be easy to prove. But when the plaintiff is not, the court has said repeatedly, it's more difficult to establish standing because whether your injury is caused by or will be redressed by the court's decision depends on decisions by third parties, which may or may not be true. And you need evidence to support a conclusion that that would be true. I welcome the court's questions. Mr. Kneedler, wasn't the goal of the California regulations to reduce the use of petitioner's  Certainly in 2013 when it was adopted. I think this is an important point. In 2013, where the fuel producers were already selling in the market, it would have been, I think, quite easy to show that their injury derived from this new regulation. It was caused by that regulation, and it would be redressed by lifting it. It's now 10 years later, though, that manufacturers and no one else challenged the waiver in 2013. In the meantime, there has been 10 years of practical experience in which manufacturers have adjusted and quite without regard or without resting upon the California rule. But when EPA reinstated the rule in 2022, was it intended to do nothing at all? No, not at all. On that point, I think it's important to understand the legal rationale or the legal analysis that EPA brought to bear. And this is something on which there has been changes from one administration to the next, and that's under review. But a waiver in the approach that EPA was taking is for the entire California program, not just these two particular standards. So a waiver is for the entire program. And if the entire program is necessary to address compelling and extraordinary circumstances, that's sufficient. But another important point is that... In 2022, didn't the EPA, in fact, in its submissions to the courts, say that the effect of the reinstatement was going to be to reduce gasoline emissions? They said that in 2021. Based, frankly, I think on 2019 projections, a lot happened, especially in the zero emission vehicle market. We shouldn't take the EPA's own representation seriously. I think both EPA and California made those representations in its papers. Well, yes, but was that sufficient? The evidence, as you said, is pretty thin. And it's also important to recognize... If it was so thin, I don't think that you had a grounds to reinstate the waiver. And if it's so thin, why did you say what you say in your briefs? And why did California say what it said in its briefs? Because both parties, I think, said in their briefs, yes, this is going to reduce gasoline emissions. Well, what EPA did, the principal reason that it did what it did in 2022, was because it concluded that the withdrawal of the previous waiver was unlawful. It was correcting an error before. It was not a new waiver. What EPA did was conclude that what it had done in 2019 was unlawful for a variety of reasons. It rested on an erroneous interpretation of the statute, the one that I was just mentioning to you about, do you look at the whole program or do you look at particular standards? So they were going back without making a brand new assessment. And that's why I think it's important to recognize that between 2013, there's no doubt that in 2013 that the fuel producers were injured and that that would have been redressed by rescinding the rule. But that's not the case now because the manufacturers have adjusted and the market now reflects the fact that there's no particular reason to assume, or at least there is objective evidence contradicting the proposition, that the manufacturers would change their behavior in a material way. The California intervenors said that California's regulation would mitigate competitive disadvantage by ensuring, quote, a level playing field, close quote, for manufacturers who wanted to produce more fuel efficient vehicles. I just don't see how that statement alone doesn't destroy everything you're arguing. Meaning if what it's doing is mitigating a competitive level or supporting a competitive system, isn't that a negative effect on them? Let me make one other point because I think it's responsive to that. The D.C. Circuit was relying on both FRAP and the local Rule 28 that addresses how an assertion of standing should be raised on a direct petition for review. It has to be raised in the opening brief with any supporting materials. The only thing that was submitted here were the 14 declarations that in a manner said that their injuries would be, the petitioner's here, their injuries would be ameliorated if this was adopted. But now we have a full record. Address Mr. Wall's concern, which is if we reverse for the D.C. Circuit to look at this again, vacate and remand only. Correcting their 2025 ending date misperception. Are you saying that we should not just say they have standing on what we have before us now? No, I think if the court is uncertain, it should vacate. No, if we're not uncertain. Well, but what you have here is effectively a summary judgment ruling in favor of EPA. If you think that there are disputed issues of fact going to the question of whether, what the effect of the reinstatement was, then just like any other situation, it should go to the trier of fact to determine what the effect would be. There should not, otherwise you're effectively relying on the categorical rule or prediction that we think is wrong. We agree that it should be fact-based. In the D.C. Circuit, EPA did not challenge standing. That's correct. And that's unusual in my experience. Why not? It did not, and I think maybe it should have, I think, particularly in retrospect. Isn't that a tell here? I mean, EPA, as you of course know, routinely raises standing objections when there's even a hint of a question about it. But when later on, after the government filed its brief, that's when California made its standing submission in its later filed brief. And then it should have been incumbent on petitioners to respond to that with something beyond the conclusory affidavits that they did. And they really didn't come back with anything substantial in their reply brief, and they sought to file a supplemental brief, which the D.C. Circuit rejected, and they haven't sought review of that here. But I want to stress that we agree with the observation by a number of the justices that this should be a factual inquiry. There may be many situations in which it should be easy, and I think that that would cover most of the categories that Mr. Walls is mentioning. If you have a directly regulated party, this Court has said repeatedly, it's probably going to be pretty easy to establish standing. But when the redressability turns on decisions by a third party, not before the Court, I think it's not a good idea to establish effectively a categorical or common sense or predictive rule, because there are a number of situations in which the Court has concluded that the fact that they're independent decision-makers defeats standing. So, Mr. Kneedler, is this really about — I'm just trying to think back to your conversation with Justice Thomas and Justice Kagan. Is this really about the sort of development of facts on the ground? It sounds to me like what you're saying is that originally, back in 2013, when this regulation was initially enacted and everybody knew and said it was to reduce fuel emissions, that a lawsuit brought at that moment has injury causation and redressability, noting that causation and redressability are actually two different factors with respect to standing, but that, you know, however many years later, in 2022, because the auto industry has actually on the ground adjusted to the regulation and no longer has a demand for the fuel products, you might have injury, you might have causation, but I think you're saying you no longer have redressability in that situation, that this might be one of the rare instances in which these things aren't lining up 10, 12 years later in the same way they would at the beginning and, therefore, a bright-line rule that just has us thinking about the initial scenario, like was there injury, was there — is it common sense that it's not going to work because what we're really supposed to be thinking about in redressability land is the facts on the ground and whether or not this changing, this regulation, is going to make any difference. I think that's exactly right, and this is a situation where redressability gets separated, and maybe it would be helpful if I illustrated this in another way. If a manufacturer had brought a challenge to this regulation, of course no manufacturer had done so, the manufacturer would have been required to say, if this waiver is set aside, I will engage in the conduct that regulation prohibits, which is producing a fleet that doesn't comply with the California measures. At the beginning, we'd be predicting that the manufacturer would be — at the beginning, we'd be predicting the manufacturer would say that if they were the plaintiff, and we'd be looking at evidence to see if that was going to happen. Here, it's already happened that they've results, right? And there's certainly no evidence, as far as I can see, that there would be an immediate material change in what manufacturers would do, or at least that was the conclusion the District — or the Court of Appeals drew from the record. Maybe down the road, 5, 10 years ago, or in the future, someday, the manufacturers might decide that they want to change their conduct, but this Court has said such someday intentions, down the road, are not sufficient to establish standing. It's too contingent. It's too speculative. So, A for Ferrari, the same thing should be true of the fuel producers, who are not the directly regulated parties, and they should be required to show that the manufacturers would change their behavior here and now, not sometime in the future. So, I think that lines up with what this Court has said in Defenders of Wildlife and other cases. And what may seem odd here is, I think, precisely the mismatch that Justice Jackson was referring to, and I don't think the Court should adopt a categorical or new rule or new principles of standing to deal with this particular case, because this is actually the quintessential case in which there should be factual determination, because there is evidence that what one might think about common sense or prediction or the way the market might react is not so in this case. And so, there should at least be an opportunity for the government to show that it's not so, and for the Court of Appeals, in this case, to determine what does the evidence in the case show. Suppose there were an affidavit by one carmaker saying that, if this waiver is rescinded, we will manufacture one additional car. Would that be enough? We absolutely commit ourselves, we will manufacture one more car. I think there are many situations in which, you know, one person saying that would be enough. One of the things, again, that is, I think, cautionary in this case is that that begins to look a lot like the probability from some of the Court's other cases, like if one member of the Sierra Club could say, surely one member will be injured, and therefore we should have standing. The question here isn't what one manufacturer would do, but do any of the individual plaintiffs benefit from what that one manufacturer will do by producing an additional car? That's why I think the Court ought to think about this in broader terms, whether there will be a material change in the industry. Otherwise, you're allowing the corn farmer or a small liquid fuel producer to have standing because one car might be produced. Thank you, counsel. Justice Thomas? Well, one more question. By my count, the EPA has now changed its mind on this four times, am I right? Yes, I think that's right. So what is the probability that there will not be a fifth? Well, it is under the precedent in an executive order directed EPA to examine issue measures that might have an effect, and EPA is undertaking that. So I can't say what EPA will decide, but this is one of those that has indeed gone back and forth. But I don't think that should affect the standing analysis, because despite that back and forth, the manufacturers have gone forward with their own plans because of their own sustainability concerns or looking to the future, or they're making investments and they want to stick by that path. Justice Sotomayor? You're not a bidding man, are you? Pardon me? You're not a bidding man that you don't want to guess that there's going to be a fifth change? I'm respecting the administrative process, I know. Justice Kagan? I mean, just out of curiosity, is there anything you can say about the timing of that process? Not at this point. I think the general tenor of the executive order was to do this expeditiously or with due consideration, but no, I don't have anything specific. Justice Gorsuch? Justice Kavanaugh? Justice Barrett? Justice Jackson? Thank you, counsel. Mr. Klein? Mr. Chief Justice, and may it please the Court. Federal courts don't assume their standing. The presumption runs the other way. The party who brings a case must establish that it, in fact, meets each element of standing. That may be easier or harder, depending on the case, and Petitioner's case had unique problems. EPA first approved this waiver in 2013, and the automakers quickly started working to meet the But this case started in 2022. The technology and market had changed. Petitioners relied on decade-old predictions from the original waiver proceedings, but the only up-to-date evidence showed surging consumer demand for clean cars and automaker sales well above any regulatory requirements. Petitioners failed their burden to establish a non-speculative likelihood that automakers would sell more gas cars and petitioners sell more fuel without the waiver, and there is no basis for inventing categorical rules that would have courts exercise Article III power where the elements of standing don't, in fact, exist. I welcome the Court's questions. Well, if you're accurate about where the auto manufacturers are now, are you willing to say your rules are unnecessary? Well, Your Honor, we would agree that this set of standards is not having an effect. Are you willing to say they're unnecessary? They're not necessary for our emissions goals. The statutory meaning of need in Section 209B is very precise. It refers to, as this EPA decision correctly interpreted it, it refers to the need for California to have a separate vehicle emissions program as a whole at all, not the need for each successive individual waiver or standard, and we do have a need for our entire program as a whole. So can you say that each element of the automotive industry, manufacturing industry, is satisfied or making or adjusting to your rules? Let's say, for example, can you say that heavy trucking or medium trucking or large RVs are all accepting of your rule and complying with it? Well, I guess I haven't thought about that because this standard affects light-duty vehicles, which include pickup trucks, I think, but not the other things that you've mentioned. But as a broader question, if the question is about the broader market of vehicles, as a whole, I think, you know, the court had nothing to do but speculate as to whether some Okay, well, let's just take the trucks then. Let's take the light trucks. Are you willing to say that without your rules, the light truck industry would continue marketing the mix of vehicles it's currently marketing or manufacturing? We can't guarantee that, but I can say it was petitioner's burden to create a non-speculative to establish a non-speculative likelihood under this court's precedent. Why would you expect that of them if you're not willing to say your rules are unnecessary at this point or ineffectual? Well, Your Honor, this court's cases have always put the burden on a plaintiff or the party who invokes federal jurisdiction to support with facts. Now, we did address the only facts they brought, which were facts about the California market with 2012-2013 predictions. But it was not our burden to disprove every possible likelihood, every possible Mr. Klein, I'm wondering, actually, whether you, in fact, made their case for them. So I'm thinking here of the Vanderspeck Declaration, which was submitted in support of your motion to intervene. And here's one of the things it says. There are a couple more, but it says, should EPA's restoration of California's waiver for the State's existing light-duty vehicle greenhouse gas emission and ZEV standards be overturned, should those be overturned, it would result in higher criteria pollutant and greenhouse gas emissions. Doesn't that just sort of make their case? Well, it would — That's out of your own mouth. It was, Your Honor, and let me place it in context. That declaration was filed within days of the petitions for review. And to support one basis of our intervention, not our independent basis, as a sovereign whose laws would be preempted, to support one basis, the declarations relied on and cited preexisting analyses, which were themselves based on 2019 DMV data. And it turned out that when the parties had the burden to really address standing before the Court could exercise its power on the merits, we presented evidence that that 2019 data was no longer representative of the actual market. The market had dramatically changed, and we did promptly bring that to the Court's attention. And petitioners never responded about the condition of the market in 2022. They doubled down on presumptions and assumptions and categorical rules, and they cited — and I want to be clear about this — Mr. Wall cited JA-66. And if you look at that page, it addressed the 2013 and 2019 records that EPA had, because by the time the 2022 restoration decision was coming around, our focus and EPA's focus was that the 2019 rescission had been substantively and procedurally wrong because the 2013 record adequately supported the 2013 findings, and the 2019 record didn't give a basis to overturn that. And you can see that, for instance, from the full discussion in the appendix to the petition around pages 226 to 227 of the brief site, which shows EPA's focus on the 2013 record and whether that record was deficient as the 2019 rescission decision had found. And that's, of course, on top of what was really our fundamental argument and EPA's fundamental position, which is longstanding and from administrators throughout the life of this provision, except for this very brief period, which is that the need criterion in Section 209B refers to the need for California to have a separate vehicle emissions program at all, with all the standards we've enacted — you know, which — it's a program we've had since, frankly, before the Clean Air Act was enacted. And I also want to — MS. MILLER. Mr. Klein, can I ask you a question? What is the burden of proof if you see it here? Just more likely than not? MR. KLEIN, JR. Your cases haven't quite said that, Your Honor. The language you've used is a non-speculative likelihood. And I think the cleanest thing to look at is the non-speculative part, because if there aren't facts supporting a — a — a — MS. MILLER. So what kind of facts would you have wanted them to introduce, like affidavits from car manufacturers? MR. KLEIN, JR. They could have, but it certainly didn't need to be that. The D.C. Circuit Opinion didn't say that, and we would not say that. Anything in the — in an administrative record which shows how the directly regulated third party is likely to act, there could be additional material — MS. MILLER. But don't you think the affidavit that Justice Kagan read you, or — I mean, I think — I don't think it's speculation or wild speculation if you're relying on common-sense inferences. I mean, at some point, if you think that they've carried the burden — I'm saying that you couldn't poke holes in that. But, you know, at some point, don't you think that California could have tried to poke holes that might take them down? It just — it's not that high a burden. I guess I'm having a hard time seeing why the affidavits and common-sense inferences wouldn't just get them over that mark. MR. KLEIN, JR. Let me compare it to two of this Court's cases, Lujan v. National Wildlife Federation and the recent Carney case on Delaware judicial selection. In the Lujan case, the plaintiff submitted a declaration which, maybe on its face, would have seemed sufficient. We recreate in the area of — I think it was Green Mountain, and this mining will occur in the Green Mountain Reserve. But the United States submitted evidence that the Green Mountain Reserve was hundreds of thousands of acres, and only a small percentage was subject to the mining. This Court held there was no APA standing because the — once the plaintiff's affidavit was understood with what it actually was and wasn't saying, it was insufficient. Now, in Carney, more recently, the plaintiff said, if this judicial selection criterion was set aside, then I would apply for any Delaware judicial spot. And the defendants showed evidence that, no, there were several spots that were open recently that — where this criterion did not apply, and you would have been eligible, and you did not submit an application. And, again, it showed that what the plaintiff was saying was insufficient. Well, here, the plaintiff was saying, these 2012 predictions show that we are injured. And our evidence showed, no, that's not obvious, and there's no reason to think that's correct, because the technology had already improved, maybe thanks to our standards back during the preceding years and years. The market had already developed. Maybe it was our standards that — and — as well as other things that made auto manufacturers invest in developing that market. But the point is that by 2022, the cake was baked, or at least petitioners presented no evidence that there was — that there would be any likelihood of a change if this regulation were struck down. You don't expect the Court of Appeals to have a trial when there's affidavits that go both ways, do you? No, Your Honor. We think that would — So how does the Court of Appeals then evaluate the affidavits? Well, I think — Doesn't it have to use some kind of common-sense understanding of how markets work, if it's not going to have witnesses and what have you? Your Honor, I think the Court, as the United States brief said, courts are quite accustomed to making decisions about whether the particular inferences from some evidence has a gap — not a credibility question. This wasn't, is our expert smarter than their expert? This was a fundamental gap in the reasoning, which made them not having — which left them nothing but speculation. And so I think that — now, again, this situation will not arise that frequently. I mean, this is a kind of unheard-of nine-year gap. And in fact, petitioners have pending I assume. And for those, there will be Article III standing, because for those, the newer waiver is for standards that will require automakers to change what they're doing so that the unregulated party, the fuel sellers, will change how much fuel they sell. But that was not the case here. So is your answer to — Oh, I'm sorry. Go ahead. Go ahead. Is your answer to Justice Kavanaugh that common sense does play a role when evidence is being presented on both sides, but what you hear the other side to be saying is we should substitute where there — there doesn't need to be evidence they're saying? We can just draw these common sense inferences as a general matter? I think that's basically right, Your Honor. I mean, our point is the inferences have to be based on evidence that permits the inference. That's — you know, in Department of Commerce, there was no prediction just from the air from this Court's or the district court's field. Right. So that's your argument to the Bright Line rule. Mr. Wall says, but we did have evidence, and he points to these declarations. And you're saying, in your view, those declarations were insufficient because they were based on old or outdated information. Well, petitioners' declarations as to remedy were entirely speculative and — sorry, not speculative, conclusory, right? They just said this would be redressed if you I want to make sure the Court understands the one piece of evidence that we haven't talked about, which is Minnesota. The petitioners do not appear to contest the United States' point, and I think it's page 38 of their brief, that the Minnesota report that was buried in one of the 14 declarations and not cited in the Court of Appeal did not actually say that there would be any — that automakers would have to change what they were doing in response to the That just compared what if automakers do the bare minimum that's required under the Federal standard versus what if they do the bare minimum that would be required in the State standard and did not address what's really the question in this case, which is how can there be an injury that's redressable if automakers, for their own reasons and their own motives, are doing more than either set of regulatory requirements? Thank you, Counsel. Justice Thomas, anything else? Justice Alito? Well, just so I have it fresh in mind, could you go back to the very first question that Justice Thomas asked you? Why do you need the waiver at this point? Right. Your Honor, we — this waiver makes no difference right now to California's emissions control. So as to this particular waiver, if we were applying for it now — well, I don't think we would apply for it now, because that's why we superseded this with a new waiver that will require automakers to make a change. We achieved our goals faster and to a larger extent than we'd expected, but there's just no sign anything would change now if the waiver were struck down. So you're — do I understand your answer to say you don't need this waiver? Your Honor, no — I mean, we don't need the waiver for emissions control. We are glad that the 2019 rescission was struck down because of its erroneous substantive and procedural rulings, but this waiver is not making a difference on the ground now. Thank you. Justice O'Mara? Justice Kagan? Justice — Justice Jackson? Thank you, counsel. Rebuttal, Mr. Wall? Just a few points, Your Honor. The first, Mr. Kneedler says, look, who knows what will happen in the market five, ten years down the road. Just so, that's why the court should adopt our front-line rule. We should be allowed to compete in this marketplace because we don't know exactly what will happen down the road. But let's say that the court isn't persuaded by the front-line rule. I think you're right, Justice Kavanaugh. As long as the court repeats the language of Alliance for Hippocratic Medicine, says there are certain categories in which there are predictable effects, and says this case is one of them because it's in the upstream or downstream category, I think that comes very close to being the same thing. Why is this case one of them? Justice Alito, you're right. All we have to show is that one EV would make one fewer electric vehicle in any of 18 states. It's not just California. Mr. Klein's looking only at California. There are 18 states here, 17 others that have adopted California standards. So what was the record on that? We had California's statement in 2021 that's a JA66 saying this is critical to reduce emissions. Then you have the EPA, when it regrants the waiver, saying in 2022, California needs these standards. That's at pages 154 and 155 and footnote 180 of the petition appendix. Also pages 64, 65, 180 and 202. Says it again and again. Now I take Mr. Needler's point, the EPA did speak out of both sides of his mouth. It said on the one hand, we're not going to really go back and look at whether they need the standards. We're just looking at whether we messed up a few years ago. But they also say we've looked at the whole record and California needs the standards. I don't know exactly how to square those statements, but either they abdicated their responsibility or they said California does in fact need the standards. And then in 2022, the two CARB declarations come in. I think the Sheely statement at page 115 of the JA is as good or better than the Vanderspeck statement. California itself saying we need the waiver because otherwise we get fewer electric vehicles and more gasoline powered vehicles. Now, I thought that the one thing they would not clearly say, and I can't tell whether California is just saying it doesn't need the waiver now or that was also true back in 2022. But I didn't think that either of the United States or California would say if we had not gotten the waiver in 22, no automaker would have done anything from that day forward to the end of time. Because I thought it was something that couldn't credibly be said by anybody to the case. Because whatever would happen in California, there are lots of other states out there that are not close to the same numbers on EV penetration as California. California seemed to hedge on that, Justice Thomas, but wherever California is on that, I don't think it's right. And the one thing is Mr. Kneedler didn't go near it, and I am a betting man, Justice Sotomayor, and I bet my bottom dollar that the reason he didn't is that in some number of months, the EPA will withdraw the waiver and will say this waiver has been having an effect from the time it was reinstated and it is compelling automakers to make more EVs than would otherwise be produced in response to consumer demand. If the EPA says that in a number of months, it will be right. The last thing is I would say the court shouldn't just vacate and remand. That does pose the risk that we get ping-ponged because it doesn't correct the Court of Appeals legal errors. Even if it tells them that the standards last forever, it doesn't do anything on our front-line rule and it doesn't do anything to correct their misunderstanding of how the predictable effects test works. It is important for standing purposes, not just for us, but as our amici explain, for lots of challengers in lots of different settings, it is important that the court correct the Court of Appeals legal errors so that we can get our day in court and finally have an opportunity to make our case for why EPA and California have wrongly interpreted the Clean Air Act. Thank you. Thank you, counsel. The case is submitted.